Good morning. May it please the Court, Randy Pickett on behalf of the Plaintiff Appellant Rob Bispo. And I would like to reserve two minutes for rebuttal, please. The issue in this case is would a reasonable jury have been able to find that the control valve in the water heater was defective, either because the consumer expectation would be that the water heater would not explode when you're lighting the pilot light, or that the risk of this type of catastrophic explosion outweighed the benefits of the design? That's the issue in the case. Judge Papik seemed to focus on the normal circumstances it wouldn't have. I don't think anybody's suggesting that it would have under normal circumstances. Something different happened in this case, didn't it? Well, the water heater did explode, Your Honor. Yes. What you're saying is absolutely what we're arguing, is that no consumer would expect that this would explode in this fashion. Now, Judge Papik was hung up a lot on negligence concepts. He talked about were there prior incidents? Was this foreseeable? Was the conduct of the plaintiff the sole cause of this event? Well, he found that the valve posed almost no risk. Did he not? That's apparently what he found, Your Honor. But the fact of the matter is that this is a strict liability case along with a negligence case, and negligence, as opposed to strict liability, strict liability focuses on the product. Was it defective? In order to evaluate the risk prong, you certainly need to know something about foreseeability, don't you? Because how could you tell whether the risk you have to know something about the nature and quantity of the risk in order to know whether it should have been accounted for in the design or not. Yes, that's absolutely correct, and we agree. We do have to present some evidence in that fact, and that's why I think it's important to focus on what the defect was here, which was the fact that a rubber seal, a safety seal, had become dislodged. The experts all agree on that. This safety seal, this rubber seal, was no longer in a position where it would prevent the flow of gas into the outside atmosphere at a time when there was no source of ignition. So, in other words, the gas could go out. It could pool at lower levels, which is what happens because propane is heavier than air, and it could present the risk of an explosion. Now, the rubber seal, all the experts again agree, became unseated in some previous event. No one knows how or when or where, but they all agree that there was an event where tank pressure, and this is important because it gets to the foreseeability issue, where tank pressure in this propane, this highly volatile gas, is stored under high pressure in tanks. Whether it's your backyard barbecue and you've got a small tank or you've got a big in-ground tank, it's stored at pressures of greater than 100 psi or pounds per square inch, and it then has to be reduced. It has to be regulated or dropped down to actually less than 1 psi inside the water heater valve, and this is typically done through one or two regulators, which are attached outside the line that leads from the tank into the water heater. Now, mechanical devices fail. Regulators can fail. A person may attempt to install or use the water heater without a regulator. These are all issues of foreseeability. They're questions of fact for the jury. In 1986, the Consumer Product Safety Commission had a report which addressed this very concern, what they called high pressure event. Again, we would submit it's not high pressure. It's normal pressure inside the tank. Yes, it's high pressure inside the valve, but the valve manufacturer can foresee that. But I thought that the problem here, again on the risk front, was that attempts were made to reproduce this event on a pressure-only basis, and it didn't happen. Well, there were attempts by a plaintiff's expert to reproduce the event, and he was unable to do that, and that certainly is a factor that would enter into this. However, what we do know — But that led to at least the assumption that there was something other than just pressure that caused it. Well, again, Your Honor, and all the experts agree, and you're absolutely right, it takes both pressure plus depressing the red button that you depress when you light the pilot light. And so the defense experts say it had to be hammered on. But we know that there was no evidence that either side developed at the joint inspection. This was tested by all the experts from both sides under a protocol that was agreed upon. There was no evidence cited by anybody that shows the kind of hammer marks that would be indicative of some abuse that would not be anticipated by the manufacturer. They all found and agreed that the rubber safety seal was not where it was supposed to be. They were very happy with the seal. They were very happy with the fact that we had to have it removed and, ultimately, get it gone inside another chamber. So how does this test go forward when to look at the record fairly, it seems to me, one says nobody really knows how this happened. So what do we do about determining, first of all, whose burden is it to decide to show what happened in a way that's dealable with under the risk-benefit standard? And if whoever that person is hasn't met that burden, what happens next on summary judgment? Well, first, Your Honor, we would submit that there are two prongs. There are two ways you can show a product defect. I know. I'm asking about the second right now. We'll go to the first in a minute. Okay. With respect to the risk-benefit test, the risk here is obviously the risk of a catastrophic explosion. And our experts discuss this at length, how propane is more dangerous than natural gas, how the real problem with this is you don't know that there's this defect because it may have existed for months or even years because until the pilot light goes out and it's – Can you listen to the question? Okay. Excuse me, Your Honor. All right. It's not going to help to make a jury argument here, right? Okay. The question is, if – where we had gotten ourselves was that something other than the pressure itself must have contributed to the cause, but nobody really knows what it is. So what I want to know is, in that state of affairs, whose burden of it is it to show what happened, number one? And two, how does one apply the risk-benefit standard, which seems to require some understanding of what happened, in order to decide whether it should have been designed around if we don't really know what happened? Well, I think we do know what happened to a certain extent, Your Honor. Everyone agrees that there was a combination of excessive pressure, and there were marks and indentations on the rubber seal that reflected this, and the combination of some movement of the red button because the seal remains in place until the red – But presumably it had to be an abnormal movement of the red button because a normal movement of the red button could have been tested for, and nothing showed up. Well, again, Your Honor, it can be a normal movement of the red button because there's now high pressure. That's the situation. But that should have been a replicable event, and it wasn't replicated. Well, again, Your Honor, our expert believed that this happened at pressures of over 100 psi from the tank and go into the chamber when there is no regulator or the regulator is not working. He tested up to 85 with one particular valve. It wasn't precisely the same, and, yes, he didn't – was not able to replicate it. But, again, it's not our burden to precisely replicate it. This was discussed in some of the cases we cited. The McCabe case, which was an airbag case, said either under consumer expectations or under risk-benefit, you as a driver going down the road can expect that when you're in a collision, a side collision, your airbag will deploy. And the Court in that case, with no expert testimony whatsoever from the plaintiff, said the plaintiff had created issues of fact just by saying, I expected that my airbag would go off. And the risk of the injury was considered to outweigh the – or to create a question of fact about whether the risk outweighed the benefit. So that's, I think, precisely what the Court has to address here. We do have the expert testimony that does say what the defect was. And I think that's discussed in the Sewell case, that under certain circumstances, the plaintiff doesn't even need to show the defect because you may not be able to know precisely what happened. And in those circumstances, the plaintiff can rely on circumstantial evidence, the fact that there was an injury, the fact that there was an explosion. They talked about the fact that a driver idling at a stop sign doesn't expect his car to suddenly explode. And that's exactly what we have here. Mr. Bispo goes down to light this water heater. He doesn't expect it to blow up. So to answer Your Honor's question, and I apologize for being long-winded, I think what the jury would have to do is decide, is it reasonable for the consumer to expect that this hot water heater will not blow up when you go down to light the pilot light? And secondly, is the risk of the design that permitted, number one, the rubber seat to migrate away from its proper location, and then, number two, to not have any way for the user to know that this problem exists, so that it could go on for months and years and only when the pilot goes out, who knows why, gust of wind, whatever, only when that happens, now does the danger arise when you go down and it's in the on position and it can leak out. So this would be an issue of fact for the jury to look at and decide, both under the consumer expectation and the risk-benefit test. I think I've reserved my remaining time. Thank you. This is two seconds. Morning, Your Honors. Tom Merrick on behalf of Robert Shaw. I was also counsel, as was counsel at the trial court level. The court has highlighted, perhaps, the central fact which drives this case, and that is that this incident was unique. There was -- Well, it wasn't unique. First of all, I don't know that that determines it. But second of all, it wasn't entirely, in the sense that there had been at least one earlier incident with a similar valve years earlier, and perhaps two others, I gather. And I gather my implication, frankly, from the way the briefs were written, that it's happened again since, because everybody kept saying, up until that point, nothing had happened. So I'm surmising that it has happened again since, which obviously could be relevant at trial. I don't know if that's a fair implication or not, but that's what I got from the way the briefs were being written. So it doesn't appear, and it's unique if you stick to the absolutely same model, but if you look at it a little more broadly, it wasn't unique. Is that right? It was unique, as described by plaintiff's own expert, and also by the expert submitted on behalf of Robert Shaw. And here's why. There are not just tens of millions. There are hundreds of millions of this type of device in use throughout the United States. And certainly, as ordinary consumers, we ourselves do not go down and try to hook up these things and to service these type of units. What happened here was unique in the sense that there had to be a number of variables that had to occur  And here, what had to have occurred was first an extreme pressure. These devices are designed to fit together with pressure coming in, and this is as a result of the Consumer Product Safety Commission forcing the industry to come together, first on the supply side, that is the gas industry. Southern California was the principle behind this. They set the parameters by which pressure will come into the house or into a facility. The appliance industry had to come in and determine what type of pressure they could accept. So this device was designed to accept up to 0.5. The pressure we're talking about here we don't know exactly because no one could replicate and no one could say exactly what happened here. But likely, this 7-gallon tank was sitting out in the sun in 105-degree weather. And when you have high weather, you have high pressure on these devices. So there was extreme pressure coming in. So first we had to have high pressure. And while plaintiff's counsel and their expert can submit that that is a foreseeable event, that was not sufficient. We had to have something else occur here and here. Let me just ask, was there any warning at all posted on the tank or in the papers that accompanied the sale of the tank, a warning about do not attempt to adjust it if the pilot light goes out? First of all, yes. And the warnings are prepared by American Water Heater. We're a component part manufacturer. We prepare just the valve. And the valve is actually specified by the manufacturer to have this particular specification of 0.5. The manufacturer, American Water Heater, had plastered throughout the side of it all the warnings and instructions on the appropriate use. So they undertook the duty to warn. They undertook the instructions. And they specifically warned about the hazards of gas leaks. Did you warn them about the possibility of what might happen if the little red thing started to roam, the red button? There was no specific warning about the combination of extreme pressure and in combination with forcing the reset button because that was not an event which was something that was foreseeable, reasonably foreseeable. And that comes back to the heart of the case here that this was such a unique event. How do you know that he forced the red button or anybody forced the red button? How do you know that the forcing of the red button was part of the problem here? We don't. Right, you don't. Nobody else because it could never be replicated. So now I go back to the question I asked before. If you don't know in the end what actually caused this and what, you know, what, then whose burden is it and how does that filter into the risk-benefit standard and then I want to go to the consumer standard. Whether we're under the consumer test or under the risk-benefit, the plaintiff has the preliminary burden of coming in and demonstrating either on the consumer test or under the risk-benefit that there is some defect in the design. All right, but in order to do that, does he have to be able to demonstrate why it happened in any detail? Not necessarily, not in all cases. As opposed to it shouldn't be blowing up, period? What happened here is that the experts went down the path of trying to determine exactly what happened and so the engineers then examine, they look at the industry experience, they try to replicate, they test. And while they couldn't replicate, they theorize and they agree, that is plaintiff's expert and defense expert agree, that likely what happened here is you had to have the high pressure, extreme pressure, which this unit is not designed to receive, and you had to have force. Our expert said it was likely something like hammering it, banging on it, that type of thing, in order to dislodge, to peel off this little ring, this little rubber ring on the inside of the safety valve. Plaintiff's expert, Mr. Dunn, indicated that in order for that to happen you had to have force and that the force would have to increase exponentially as the pressure on the valve increased. In other words, you have this little small space in there and instead of having a half pound of pressure, you now have 20, 30, 50, maybe well in excess of 100. Our expert suggested it was probably over 200 because of the weather that day. In order to force that, it's not just a matter of just pushing it in with your thumb, it takes a lot of force and Mr. Dunn agreed that the force would increase with that. So that is what the experts are in agreement upon, is that you had to have the force in combination with this unusual high extreme pressure. And with that... What that means is that if there's high pressure, then you're going to have the force because that's the only way you can start the pilot light again is by pushing that button. I'm sorry, could... My understanding is what you're really saying is if there's high pressure, the person trying to start the pilot light is going to have to push hard, so there's going to be force on the red button if there's high pressure. Absolutely, and it goes so far, and this is... So therefore, what that means is that all that has to be foreseeable really is the high pressure, not the pushing of the button, because the pushing of the button is a function of the way the thing operates. If somebody comes in and wants to start the pilot light under those circumstances, there's got to be force on the button. No, because their expert also agrees that if you have high pressure, such as you would have in this situation, it would be like a teapot going off. You'd have this loud noise pushing out of the valve. It would be a teapot going off, and so when I asked Mr. Dunn, and the instructions require that you be a competent installer, and everyone agrees Mr. Bispo was not competent. At any rate, when I asked him whether or not a competent installer would be aware of this problem of high pressure, his answer was even an incompetent person would be aware of this problem, because you have this extreme pressure. As soon as you push that valve, you get this screaming teapot-like noise. So someone would have to proceed in the face of this warning. It's like a buzzsaw. A competent installer certainly wouldn't do it. Mr. Dunn even concedes an income. I'm obviously missing the mechanics of this. What does installer have to do with it? I thought this was somebody operating the hot water heater. Mr. Bispo did install it. I know, but what does the installer have to do with the problem that we're talking about now? The problem that we're talking about, as I understand it, is that there is more pressure coming into this hot water heater than there should be. Meaning that when the pilot light goes out and somebody needs to restart it, you have to push the red button. Each individual time, is that not right? Correct. So each individual time, having nothing to do with the installation, somebody's going to have to push that button pretty hard if the pilot light has gone out and there is a pressure problem. It's correct. You're instructed to push the button in, to hold it in. So I don't understand the part about the competent or incompetent installer. It has nothing to do with this scenario. Because if there is 50 or 100 pounds of pressure, as soon as you touch that button, you're going to have a screaming sound. That's not the installer. It's the person who's trying to operate the hot water heater. An incompetent person would know this. The point is that under all circumstances, you'd have to ignore this. It's like a buzzsaw putting your hand in front of a buzzsaw. Just really quickly, because your time is actually up, what about the consumer prong, which is a strange test anyway? I mean, why wouldn't somebody just expect that the thing is not going to blow up if the pilot light goes on? Perry, at the end. Well, as Your Honor knows, there's two parts to it. First, you have to determine whether it's the type of a case, the type of a defect, which is susceptible to ordinary consumer. Well, it's all about what level of detail you ask the question in. If you ask the question whether somebody thinks that if you light the pilot light, there's going to be gas around and it's going to blow up, the answer has to be no. Correct. We don't expect water heaters, and actually it wasn't the water heater, it was the gas that blew up here. We never expect that. But what happened here is so esoteric, is so unique, and it required such engineering principles as to the design. Yeah, but then you're getting into the other test. You see, that's what my understanding is, the whole point of this consumer test is to avoid that. First of all, they focused on the second part of the consumer test, and they completely ignored the first part of the test and whether or not, and Judge Patik specifically found that this was a technical esoteric field and that a consumer would not have a ready understanding, a common understanding. So they ignored that. They don't address that. But on the other side, you have to look at the likelihood of whether this is going to occur. And while they would focus on the risk, they don't focus on the likelihood. And that's where we get back down to the patent. I'm sorry I'm going to have to cut you off, but thank you very much for your argument. And you have about 20 seconds. Well, very briefly, Your Honor. First, I want to make it clear that there were actually two separate events. It wasn't the high-pressure event that occurred the morning of the explosion. That had happened before, weeks or months or even years before. So those are two separate events. And secondly, I haven't talked about public policy. The public policy behind strict liability, going clear back to Professor Prosser and to Greenman v. Yuba Power, is that manufacturers are better able to bear the cost of these injuries from a defective product. Okay. Thank you very much. Thank you, counsel, for your arguments. The case of Visco v. Robert Shaw Controls Company is submitted. And we are finished for the week. Thank you.
judges: Farris, Nelson D. W., Berzon